```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ANGELICA LAING,                      :

                    Plaintiff,       :    15 Civ. 7764 (HBP)

     -against-                       :    OPINION
                                          AND ORDER
COMMISSIONER OF SOCIAL SECURITY,     :

                    Defendant.       :

----------------------------------X
```

PITMAN, United States Magistrate Judge:

I.  Introduction

Plaintiff Angelica Laing brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for supplemental security income ("SSI").  The parties have consented to my exercising plenary jurisdiction pursuant to 28 U.S.C. § 636(c).  Plaintiff and the Commissioner have both moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, plaintiff's motion (Docket Item ("D.I.") 22) is granted and the Commissioner's motion (D.I. 16) is denied.

II.  <u>Facts</u>[1]

    A.  <u>Procedural Background</u>

       Plaintiff filed an application for SSI on September 30, 2012, alleging that she had been disabled since February 22, 2011 (Tr. 109-17).  Plaintiff completed a "Disability Report" in support of her claim for benefits (Tr. 135-41).  Plaintiff claimed that she was disabled due to depression, aggression, a propensity for violence and aural hallucinations, <u>i.e</u>., hearing voices (Tr. 136).  Plaintiff reported that she took quetiapine for insomnia (Tr. 138).

       On December 12, 2012, the Social Security Administration (the "SSA") denied plaintiff's application, finding that she was not disabled (Tr. 54-57).  Plaintiff timely requested and was granted a hearing before an Administrative Law Judge (an "ALJ") (Tr. 58-60).  ALJ Mark Solomon held a hearing on March 18, 2014 (Tr. 24-52).  The ALJ reviewed the claim <u>de novo</u> and, in a

--------

[1]I recite only those facts relevant to my resolution of the pending motion.  The administrative record that the Commissioner filed, pursuant to 42 U.S.C. § 405(g) (<u>see</u> SSA Administrative Record, dated Dec. 1, 2015 (D.I. 15) ("Tr.")) more fully sets out plaintiff's medical history.

The Commissioner filed a supplemental administrative record on May 2, 2016, which contains a report from Dr. T. Harding, a state agency psychologist (Supplemental SSA Administrative Record, dated Apr. 28, 2016 (D.I. 25) ("Supp. Tr.")).

decision dated May 22, 2014, determined that plaintiff was not disabled within the meaning of the Act from September 30, 2012 to the date of the decision (Tr. 12-20).  The ALJ's decision denying benefits became final on August 21, 2015 when the Appeals Council denied plaintiff's request for review (Tr. 1-3).  Plaintiff commenced this action on October 1, 2015, seeking review of the Commissioner's decision (Complaint, filed Oct. 1, 2015 (D.I. 2)).

   B.  Plaintiff's
       Social Background

       Plaintiff was born in 1979 and was 34 years old at the time of her hearing before the ALJ (Tr. 109).  She was placed into foster care at age nine; her mother was a drug addict and her father was a drug dealer (Tr. 40, 170).  She attended special education classes in high school and graduated; she did not attend college (Tr. 29, 137).

       At her hearing before the ALJ, plaintiff testified that she had been receiving public assistance, but it had been termi-nated without notice (Tr. 29-30).  She previously participated in the Work Experience Program (the "WEP") three days a week in order to receive her public assistance grant, and she had been participating in that program since June 2000 (Tr. 30-31).  As part of the program, plaintiff mopped floors, emptied trash and

set up rooms for different events (Tr. 45).  For the other two
days of the work week, plaintiff would search for jobs (Tr. 30-
31).  Plaintiff was discharged from WEP because of excessive
absences (Tr. 32, 37, 43).  According to plaintiff, she was
absent because she had to take care of her children, ages 12 and
15 (32-33, 37).[2]  If plaintiff did not have to take care of her
children, plaintiff testified that she could have attended the
program (Tr. 37-38).  Plaintiff's participation in WEP was the
only work she ever had (Tr. 45-46, 137).

     C. Plaintiff's
      Medical Background

         1.  Records that Pre-Date the
            Relevant Time Period

Dr. Marc Vital-Herne, M.D., treated plaintiff from
November 2006 through January 2009 for depression (Tr. 165-70).
During that time, plaintiff reported that she heard voices and
believed people were talking about her (Tr. 167-69).  Dr. Vital-
Herne noted that plaintiff did not experience overt delusions
(Tr. 166-67).  During his treatment of plaintiff, Dr. Vital-Herne
prescribed Prozac, Remeron and Haldol (Tr. 165-67).

─────────────────────

    [2]Both of plaintiff's children receive SSI because of psychi-
atric and psychological problems (Tr. 33).

4

2.  Records for the
    Relevant Time Period

    a.  Dr. Lisa Turtz, M.D.

On August 27, 2012, plaintiff visited University
Behavioral Associates of the Montefiore Behavioral Care Inte-
grated Provider Association, where Dr. Lisa Turtz, M.D., com-
pleted an Outpatient Clinical Assessment Form (Tr. 180-84).
Plaintiff reported to Dr. Turtz that she had been treated for
recurrent major depression with psychotic features in 2009 (Tr.
180).  She stated that she felt less depressed and did not have
hallucinations while taking Prozac, Remeron and Haldol (Tr. 180).

     Plaintiff reported that she had had chronic depression
since childhood (Tr. 180).  Her symptoms included a depressed
mood, anhedonia,[3] feelings of worthlessness/guilt, decreased
energy and appetite, insomnia and impaired concentration (Tr.
180).  Dr. Turtz noted that plaintiff was talking and moving
slowly (Tr. 180).

     Plaintiff also reported that nearly every day over the
previous two weeks, she had little interest or pleasure in doing

_____

     [3]Anhedonia is a "total loss of feeling of pleasure in acts
that normally give pleasure."  Dorland's Illustrated Medical
Dictionary ("Dorland's") 91 (32nd ed. 2012).

things, felt depressed, had trouble sleeping and eating, felt
tired or had little energy and was either lethargic or fidgety
(Tr. 189).  She also reported that for more than seven of the
prior fourteen days, she felt bad about herself, had trouble
concentrating on such things as reading the newspaper or watching
television and had thoughts of being better off dead or wanting
to hurt herself (Tr. 189).

      Dr. Turtz completed a mental status evaluation (Tr.
182-83).  She noted that plaintiff was well groomed and coopera-
tive (Tr. 182).  Additionally, plaintiff had full range affect
that was appropriate to content (Tr. 182).  Plaintiff's mood was
depressed, her expressive speech/language was coherent, her
receptive speech/language revealed age appropriate comprehension
of spoken words, her psychomotor activity was normal and her
thought process was circumstantial (Tr. 182-83).  Plaintiff was
alert and oriented to time, place and person (Tr. 183).  She had
a severe impairment in impulse control; as noted by Dr. Turtz,
plaintiff attacked her father with a screwdriver in 2003 (Tr.
183).  Plaintiff denied suicidal or homicidal ideation, although
she had had thoughts of wanting to die since childhood (Tr.
183).[4]  Plaintiff reported that she experienced aural and visual

---

[4]There is nothing in the record reconciling this inconsis-

hallucinations four to five times a week (Tr. 183). She also experienced paranoid ideation; plaintiff thought people knew everything about her and could read her mind (Tr. 183). Dr. Turtz diagnosed plaintiff with major depression, recurrent and severe, with psychotic features versus schizoaffective disorder and assessed plaintiff a Global Assessment of Functioning ("GAF") score of 50 (Tr. 183-84).[5] Dr. Turtz prescribed Seroquel (Tr. 183).

Plaintiff called Dr. Turtz on September 10, 2012 (Tr. 185). She reported that she felt better on Seroquel and did not believe that she needed an increased dosage (Tr. 185). Plaintiff was not having any aural or visual hallucinations (Tr. 185). She also reported that although she continued to experience paranoid

---

[4](...continued)
tency.

[5]"The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008), quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000). A score of 41-50 indicates serious symptoms, a score of 51-60 indicates moderate symptoms and a score of 61-70 indicates some mild symptoms or some difficulty in social or occupational functioning, but generally functioning "pretty well." See Global Assessment of Functioning, New York State Office of Mental Health, available at https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf (last visited Mar. 9, 2017).

ideation, such paranoia bothered her less because of the Seroquel (Tr. 185).

Plaintiff returned to Dr. Turtz on September 24, 2012 (Tr. 185).  Plaintiff reported that she was taking her medication and that she had only one to two episodes of aural hallucinations and one to two episodes of visual hallucinations since her last visit (Tr. 185).  Plaintiff also felt "slightly less" paranoid on her medication (Tr. 185).  She continued to have thoughts of wanting to die, but they occurred less frequently, which plain- tiff attributed to the Seroquel (Tr. 185).  Dr. Turtz increased plaintiff's dosage of the medication (Tr. 185).

On October 15, 2012, plaintiff reported to Dr. Turtz that she felt calmer on the increased dosage of Seroquel (Tr. 185).  Plaintiff was experiencing both aural hallucinations and visual hallucinations two to three times a week (Tr. 185-86).  Plaintiff described the aural hallucinations as voices calling her name or threatening her and the visual hallucinations as flashes of light and as shadows in the shape of bodies (Tr. 186).  Dr. Turtz referred plaintiff to an ophthalmologist for the flashes of light she was seeing (Tr. 186).  Plaintiff also reported that she continued to experience paranoia, but felt that Seroquel was more helpful than her previous medications (Tr. 186).  Plaintiff also stated that she avoided a physical alterca-

8

tion with another parent at her son's after-school program only because someone intervened (Tr. 186).  Dr. Turtz again increased plaintiff's dosage of Seroquel (Tr. 186).

On November 19, 2012, plaintiff reported that she continued to feel calmer and less paranoid on Seroquel, although she continued to feel that people were talking about her and disrespecting her (Tr. 187).  Plaintiff reported that she experienced aural hallucinations twice per week and visual hallucinations four times per week (Tr. 187).  Plaintiff had not had any angry outbursts since her last visit (Tr. 187).  Dr. Turtz increased plaintiff's dosage of Seroquel (Tr. 187).

On December 17, 2012, plaintiff reported that she was feeling better on the increased dosage of Seroquel (Tr. 242).  Plaintiff no longer had any aural hallucinations (Tr. 242).  She continued to see shadows or black dots, but stated that she would see an ophthalmologist (Tr. 242).  Plaintiff felt less afraid and less paranoid, and her feeling that people were talking about her was "much milder" (Tr. 242).  She no longer felt that people were disrespectful or threatening towards her (Tr. 242).  Moreover, she had not had any angry outbursts (Tr. 242).

On March 11, 2013, plaintiff reported that she continued to feel better on Seroquel (Tr. 243).  She had had one or two aural hallucinations since her last visit; during those episodes,

the voices she heard were critical of her and talked about
hitting her (Tr. 243).  Plaintiff also reported that she con-
stantly saw shadows of people and black dots, though she reported
that she had an appointment to see an ophthalmologist (Tr. 243).
She also continued to feel paranoid and was afraid that people
would hurt her (Tr. 243).  Although she continued to have epi-
sodes of anger, they were milder (Tr. 243).  Plaintiff reported
that she got angry a week and a half before the appointment
because a woman on the bus pushed her son; plaintiff yelled at
the woman and felt like physically attacking her, but plaintiff
was able to control that impulse (Tr. 243-44).  Plaintiff contin-
ued to have thoughts of wanting to die four to five times a week
(Tr. 244).  Dr. Turtz increased plaintiff's dosage of Seroquel
yet again (Tr. 244).

Plaintiff next saw Dr. Turtz on April 15, 2013.
Plaintiff felt she was stable on the increased dosage of Seroquel
(Tr. 244).  Since her last visit, plaintiff had only one aural
hallucination (Tr. 244).  She continued to see shadows and black
dots, though she had an appointment to see an ophthalmologist
(Tr. 244).  Plaintiff reported that she was calmer and less
paranoid, although she did get angry the morning of the appoint-
ment because two school girls on the bus had called her names

(Tr. 244).  Plaintiff reported that she was no longer having
thoughts of wanting to die (Tr. 244).

Dr. Turtz next examined plaintiff on May 20, 2013.  Dr.
Turtz reported that plaintiff was at a "fairly stable baseline"
on the current dosage of Seroquel (Tr. 197).  Dr. Turtz noted
that plaintiff continued to have visual hallucinations every day,
though she was scheduled to see an ophthalmologist (Tr. 194,
201).  Plaintiff also had "far fewer" episodes of aural halluci-
nations (Tr. 194).  Dr. Turtz further noted that plaintiff felt
less angry and less paranoid as long as she complied with her
medication regimen (Tr. 194, 201).  Additionally, plaintiff had
fewer thoughts of wanting to die (Tr. 194).

Dr. Turtz found plaintiff to be well-groomed, coopera-
tive and depressed (Tr. 196).  Plaintiff's psychomotor and speech
were normal and her affect was appropriate (Tr. 196).  Plain-
tiff's thought process was logical and goal-directed (Tr. 196).
She had paranoid ideation, visual hallucinations and aural
hallucinations (Tr. 196).  Plaintiff also had normal cognition
and was oriented to time, place, person and situation (Tr. 196).
Plaintiff had average intelligence, normal reasoning and intact
memory, judgment, insight, attention/concentration, executive
functioning and language (Tr. 196).  Plaintiff's GAF score was

50, and Dr. Turtz diagnosed plaintiff with schizoaffective
disorder (Tr. 197).

On July 1, 2013, plaintiff returned to Dr. Turtz.  Dr.
Turtz reported that plaintiff remained stable on Seroquel (Tr.
198).  Plaintiff had occasional paranoid thoughts and experienced
aural hallucinations twice per week (Tr. 198).  Dr. Turtz also
noted that plaintiff possibly had floaters,[6] as opposed to visual
hallucinations, and that plaintiff planned to see an ophthalmolo-
gist (Tr. 198-99).  Plaintiff no longer had thoughts of wanting
to die (Tr. 199).

Dr. Turtz's mental status examination of plaintiff
yielded the same results as the examination she conducted on May
20, 2013 (Tr. 200).  Again, plaintiff's GAF score was 50, and Dr.
Turtz diagnosed her with schizoaffective disorder (Tr. 200).

On August 5, 2013, Dr. Turtz reported that plaintiff
remained stable on Seroquel (Tr. 213).  Plaintiff had occasional
paranoid thoughts and one to two aural hallucinations since her
last visit (Tr. 213).  Dr. Turtz also reported that plaintiff had
seen an ophthalmologist and had been diagnosed with a cataract in
her right eye (Tr. 213).  Plaintiff no longer had any thoughts of

---

[6]Also known as "spots before the eyes," floaters are "depos-
its in the vitreous of the eye, usually moving about and probably
representing fine aggregates of vitreous protein occurring as a
benign degenerative change."  Dorland's at 718.

wanting to die (Tr. 213).  Dr. Turtz also noted that plaintiff had started a job training/job search program (Tr. 213).

Dr. Turtz's August 5, 2013 mental status examination of plaintiff yielded the same results as her previous examinations on May 20, 2013 and July 1, 2013 (Tr. 214).  Again, plaintiff's GAF score was 50, and she was diagnosed with schizoaffective disorder (Tr. 214).

Plaintiff saw Dr. Turtz again on October 28, 2013.  Dr. Turtz noted that plaintiff remained stable on Seroquel (Tr. 219). Plaintiff had occasional paranoid thoughts and aural hallucinations one or two times per month (Tr. 219).  Plaintiff underwent cataract and laser surgery in September 2013 and no longer saw black dots or otherwise experienced visual hallucinations (Tr. 219).  Plaintiff no longer had thoughts of wanting to die (Tr. 219).  Dr. Turtz noted that plaintiff was involved in WEP (Tr. 219).

Dr. Turtz's mental status examination of plaintiff yielded the same results as her previous examinations (Tr. 220). Plaintiff's GAF score was again 50, and Dr. Turtz diagnosed her with schizoaffective disorder (Tr. 221).

Plaintiff returned to Dr. Turtz on January 13, 2014 and reported that she ran out of Seroquel one or two months before-hand (Tr. 223).  While off the medication, plaintiff had paranoid

13

thoughts on a daily basis and experienced aural hallucinations
and thoughts of wanting to die (Tr. 223).  Plaintiff no longer
had visual hallucinations after treatment by the ophthalmologist
(Tr. 223).  Dr. Turtz noted that plaintiff was participating in
WEP (Tr. 223).  She also indicated that plaintiff had a tendency
to get agitated, angry and irritable if someone was condescending
to her at work, although she was less irritable and angry when
she was taking her medication (Tr. 223).

On mental status examination, plaintiff was well-
groomed, cooperative and depressed (Tr. 224).  Plaintiff's
psychomotor and speech were normal and her affect was appropriate
(Tr. 224).  Plaintiff's thought process was logical and goal-
directed (Tr. 224).  She was experiencing paranoid ideation and
aural hallucinations (Tr. 196).  Plaintiff also had normal
cognition and was oriented to time, place, person and situation
(Tr. 224).  Plaintiff had average intelligence, normal reasoning
and intact memory, judgment, insight, attention/concentration,
executive functioning and language (Tr. 224-25).  Dr. Turtz
renewed plaintiff's prescription for Seroquel (Tr. 223).

b.  Dr. Arlene Broska, Ph.D.

At the request of the SSA, Dr. Arlene Broska, Ph.D.,
performed a consultative examination of plaintiff on November 14,

14

2012.  Dr. Broska noted that plaintiff came to the appointment by herself on public transportation (Tr. 176).  Plaintiff reported that she lived with her two children (Tr. 176).

Plaintiff reported that she had difficulty falling asleep (Tr. 176).  Her appetite varied, and she often felt sad (Tr. 176).  Plaintiff reported strained family relationships and a difficult childhood (Tr. 176).  She stated that she got irritable, angry and anxious and that she smoked cigarettes when stressed (Tr. 176-77).  Plaintiff often felt that people did not want to help her and that they only judged and provoked her (Tr. 176).  She felt that she could not trust people and that people brought problems to her (Tr. 177).  Plaintiff reported that she got into many arguments, which sometimes led to physical altercations (Tr. 176).  She also reported that she always worried that something bad would happen to her children (Tr. 177).  Plaintiff also stated that she felt as if people were talking about her, though she knew they were just involved in their own conversations (Tr. 177).  However, plaintiff would react to this feeling, which led to problems (Tr. 177).

Plaintiff reported that she was able to dress, bathe and groom herself (Tr. 178).  She cooked and prepared food five times a week, cleaned and did laundry once a week, shopped twice a week and traveled independently on public transportation (Tr.

15

178).  Plaintiff did not socialize, and she watched television
and listened to the radio (Tr. 178).

On mental status examination, plaintiff was casually
dressed and well groomed (Tr. 177).  Her demeanor and responsive-
ness to questions were cooperative (Tr. 177).  Her manner of
relating, social skills and overall presentation were adequate
(Tr. 177).  Plaintiff's posture and motor behavior were normal,
and eye contact was appropriate (Tr. 177).  Her speech intelligi-
bility was fluent, the quality of plaintiff's voice was clear and
her expressive and receptive language abilities were adequate
(Tr. 177).  Plaintiff's thinking was coherent and goal-directed,
with no evidence of hallucinations, delusions or paranoia during
the examination (Tr. 177).  Plaintiff's affect was full range and
appropriate in speech and thought content, her mood was neutral,
her sensorium was clear and she was oriented to time, place and
person (Tr. 178).  Plaintiff's attention and concentration were
intact and her recent and remote memory skills were within normal
limits (Tr. 178).  Dr. Broska estimated plaintiff's level of
intellectual functioning to be in the average range with a

general fund of information appropriate to experience (Tr. 178).
Plaintiff's insight and judgment were poor (Tr. 178).

> Dr. Broska opined that
>
> > it appears the claimant can follow and understand
> > simple directions and instructions.  She can perform
> > simple tasks independently.  She is able to maintain
> > attention and concentration; her memory is within
> > normal limits.  It appears she can maintain a regular
> > schedule.  She can perform complex tasks independently.
> > She may not always make appropriate decisions, relate
> > adequately with others, or appropriately deal with
> > stress.
> >
> > The results of the examination appear to be con-
> > sistent with psychiatric problems and it may interfere
> > with her ability to function on a daily basis without
> > mental health treatment.

(Tr. 178-79).  Dr. Broska diagnosed plaintiff with mood disorder,
not otherwise specified, and personality disorder, not otherwise
specified (Tr. 179).

### c.  Dr. T. Harding, Ph.D.

At the request of the SSA, Dr. T. Harding, Ph.D., a
state agency psychologist, reviewed the record and completed a
Psychiatric Review Technique form and a Mental Residual Func-
tional Capacity Assessment (Supp. Tr. 257-60).  Dr. Harding
opined that plaintiff had moderate limitations in her ability to:
(1) understand and remember detailed instructions; (2) perform
activities within a schedule, maintain regular attendance and be

punctual within customary tolerances; (3) work in coordination
with or proximity to others without being distracted by them; (4)
complete a normal workday and workweek without interruptions from
psychologically-based symptoms and to perform at a consistent
pace without an unreasonable number and length of rest periods;
(5) accept instructions and respond appropriately to criticism
from supervisors; (6) get along with co-workers or peers without
distracting them or exhibiting behavioral extremes and (7)
respond appropriately to changes in the work setting (Supp. Tr.
259-60).  He also opined that plaintiff was not significantly
limited in her ability to:  (1) remember locations and work-like
procedures; (2) understand and remember very short and simple
instructions; (3) carry out very short and simple instructions;
(4) carry out detailed instructions; (5) maintain attention and
concentration for extended periods; (6) sustain an ordinary
routine without special supervision; (7) make simple work-related
decisions; (8) interact appropriately with the general public;
(8) ask simple questions or request assistance; (9) maintain
socially appropriate behavior and to adhere to basic standards of
neatness and cleanliness; (10) be aware of normal hazards and
take appropriate precautions; (11) travel in unfamiliar places or
use public transportation and (12) set realistic goals or make
plans independently of others (Supp. Tr. 259-60).  Based on the

18

evidence in the record, Dr. Harding concluded that plaintiff was
not disabled (Supp. Tr. 262).

      D.   Proceeding
         <u>Before the ALJ</u>

      An attorney represented plaintiff at the March 18, 2014
hearing before ALJ Solomon (Tr. 26).  Plaintiff testified at the
hearing.  She explained that she heard voices or had visual
hallucinations two to three times per week while on her medica-
tion (Tr. 34, 38-39).  While her visual hallucinations stopped
after seeing an ophthalmologist, they subsequently "started back
up again" (Tr. 34).  At the time of the hearing, plaintiff was
still seeing her psychiatrist every two or three months (Tr. 36).

      Plaintiff testified that she was unable to travel on
public transportation unless unaccompanied by either her children
or her father (Tr. 34-35).  She explained that she could not
travel by herself because she constantly got into disagreements
with other people because she believed they were trying to
provoke her (Tr. 35).  She explained that she mostly got into
disagreements with other adults regarding her children (Tr. 39).

      Plaintiff further testified that she could shower and
dress by herself, but someone needed to accompany her when she
shopped because the bags of groceries were too heavy and she

19

always ran into rude people (Tr. 35, 40-41).  Plaintiff's chil-
dren helped her clean the house, cook and do laundry (Tr. 41).
Plaintiff spent most of the day at home (Tr. 36).

Plaintiff explained that she could not work because she
could not concentrate, socialize or work in a team (Tr. 37).
Plaintiff got frustrated; if she felt pain in her body while
working, she would let someone know that she was in pain (Tr.
37).  If that person could not "understand that," plaintiff would
stop working (Tr. 37).

The ALJ also heard testimony from Melissa Fass-Karlin,
a vocational expert (Tr. 44).  She testified that plaintiff was
previously a cleaner, which is medium, unskilled work, with a
specific vocational preparation time ("SVP") of two[7] (Tr. 47).

---

[7]SVP refers to the amount of time it takes for an individual
to learn a given job.  Bradley v. Commissioner of Soc. Sec., 12
Civ. 7300 (ER), 2015 WL 1069307 at *5 n.7 (S.D.N.Y. Mar. 11,
2015) (Ramos, D.J.) (adopting report and recommendation), citing
Urena-Perez v. Astrue, 06 Civ. 2589 (JGK)(MHD), 2009 WL 1726217
at *20 n.43 (S.D.N.Y. Jan. 6, 2009) (Dolinger, M.J.) (Report &
Recommendation), adopted by and modified on other grounds, 2009
WL 176212 (S.D.N.Y. June 18, 2009) (Koeltl, D.J.).  It utilizes a
scale from one to nine; the higher the number, the greater the
skill required to do the job.  Bradley v. Commissioner of Soc.
Sec., supra, 2015 WL 1069307 at *5 n.7, citing Urena-Perez v.
Astrue, supra, 2009 WL 1726217 at *20 n.43.  An SVP of two means
that "it takes anything more than a short demonstration, and
potentially up to thirty days, to learn a job."  Rodriguez v.
Astrue, 07 Civ. 534 (WHP)(MHD), 2009 WL 637154 at *10 n.23
(S.D.N.Y. Mar. 9, 2009) (Pauley, D.J.), citing Jeffrey Scott
Wolfe & Lisa B. Proszek, Social Security Disability and the Legal
(continued...)

The ALJ asked the expert to assume that an individual had the ability to perform work "related to mental and physical activities," with the following nonexertional limitations:  the individual could remember, understand and carry out simple instructions, maintain attention and concentration for rote work, maintain a regular schedule and perform a low stress job, defined as one with only simple decision-making and no close contact with the general public (Tr. 47).  The ALJ asked whether the individual would be able to perform plaintiff's past relevant work, and the expert testified that such an individual would (Tr. 47).  The ALJ asked whether the answer would be the same if the individual could only have occasional close contact with supervisors and co-workers; the expert testified that those facts would not change her answer (Tr. 47-48).

The ALJ next asked the expert to assume that an individual had the same age, education, work experience and RFC as plaintiff (Tr. 48).  The ALJ then asked whether the individual could still be a cleaner, and the vocational expert answered in the affirmative (Tr. 48).  The individual could also be a hand packager and kitchen helper (Tr. 48).  The expert testified that the individual would be able to perform those jobs even if she

---

[7](...continued)
Profession 163 (2002).

were limited to occasional close contact with supervisors and co-
workers (Tr. 48).

          The ALJ next asked the vocational expert to assume the
same hypothetical individual with the plaintiff's age, education
and work experience, with the same limitations except that the
individual would be unable to maintain attention and concentra-
tion for rote work (Tr. 49).  The ALJ asked whether there would
be any jobs such an individual could do, and the expert testified
that there would not be (Tr. 49).  The ALJ asked the expert to
again assume the same hypothetical individual, with a limitation
that she have no close contact with others at all (Tr. 49).  The
vocational expert testified that there would not be any jobs such
an individual could do (Tr. 49).  Again, the ALJ asked the expert
to assume the same hypothetical individual, with the additional
limitation that she would be expected to miss more than one day
of work a month as a result of her psychiatric symptoms (Tr. 49).
The ALJ asked whether there would be any jobs that the individual
could do, and the expert testified that there were no jobs such
an individual could do (Tr. 49).  If the hypothetical individual
would be off-task more than five percent of the time, the expert
testified that there would be no jobs for her (Tr. 49-50).

III.  Analysis

    A.  Applicable
       Legal Principles

       1.  Standard of Review

      The Court may set aside the final decision of the
Commissioner only if it is not supported by substantial evidence
or if it is based upon an erroneous legal standard.  42 U.S.C.
§ 405(g); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per
curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012);
Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).  Moreover,
the court cannot "'affirm an administrative action on grounds
different from those considered by the agency.'"  Lesterhuis v.
Colvin, 805 F.3d 83, 87 (2d Cir. 2015) (per curiam), quoting
Burgess v. Astrue, supra, 537 F.3d at 128.

      The Court first reviews the Commissioner's decision for
compliance with the correct legal standards; only then does it
determine whether the Commissioner's conclusions were supported
by substantial evidence.  Byam v. Barnhart, 336 F.3d 172, 179 (2d
Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir.
1999).  "Even if the Commissioner's decision is supported by
substantial evidence, legal error alone can be enough to overturn
the ALJ's decision."  Ellington v. Astrue, 641 F. Supp. 2d 322,

328 (S.D.N.Y. 2009) (Marrero, D.J.).  However, "where application
of the correct legal principles to the record could lead to only
one conclusion, there is no need to require agency reconsidera-
tion."  Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

       "'Substantial evidence' is 'more than a mere scintilla.
It means such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion.'"  Talavera v. Astrue,
supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S.
389, 401 (1971).  Consequently, "[e]ven where the administrative
record may also adequately support contrary findings on particu-
lar issues, the ALJ's factual findings 'must be given conclusive
effect' so long as they are supported by substantial evidence."
Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam),
quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).
Thus, "[i]n determining whether the agency's findings were
supported by substantial evidence, the reviewing court is re-
quired to examine the entire record, including contradictory
evidence and evidence from which conflicting inferences can be
drawn."  Selian v. Astrue, supra, 708 F.3d at 417 (internal
quotation marks omitted).

2.   Determination
     of Disability

A claimant is entitled to SSI if the claimant can establish an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."[8] 42 U.S.C. § 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to work must last twelve months).

The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 1382c(a)(3)(D), and it must be "of such severity" that the claimant cannot perform her previous work and "cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).  Whether such work is actually available in the area where the claimant resides is immaterial.  42 U.S.C. § 1382c(a)(3)(B).

_____

[8]The standards that must be met to receive SSI benefits under Title XVI of the Act are the same as the standards that must be met in order to receive disability insurance benefits under Title II of the Act.  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases addressing the latter are equally applicable to cases involving the former.

In making the disability determination, the Commis-
sioner must consider:  "'(1) the objective medical facts; (2)
diagnoses or medical opinions based on such facts; (3) subjective
evidence of pain or disability testified to by the claimant or
others; and (4) the claimant's educational background, age, and
work experience.'" Brown v. Apfel, 174 F.3d 59, 62 (2d Cir.
1999) (per curiam), quoting Mongeur v. Heckler, 722 F.2d 1033,
1037 (2d Cir. 1983).

In determining whether an individual is disabled, the
Commissioner must follow the five-step process required by the
regulations.  20 C.F.R. § 416.920(a)(4); see Selian v. Astrue,
supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at
151.  The first step is a determination of whether the claimant
is engaged in substantial gainful activity.  20 C.F.R. §
416.920(a)(4)(i).  If she is not, the second step requires
determining whether the claimant has a "severe medically determi-
nable physical or mental impairment."  20 C.F.R. §
416.920(a)(4)(ii).  If she does, the inquiry at the third step is
whether any of these impairments meet one of the listings in
Appendix 1 of the regulations.  20 C.F.R. § 416.920(a)(4)(iii).
To be found disabled based on a listing, the claimant's medically
determinable impairment must satisfy all of the criteria of the
relevant listing.  Sullivan v. Zebley, 493 U.S. 521, 530 (1990);

26

Otts v. Commissioner of Soc. Sec., 249 F. App'x 887, 888 (2d Cir. 2007) (summary order); 20 C.F.R. § 416.920(a)(4)(iii).  If the claimant meets a listing, the claimant is disabled.  20 C.F.R. § 416.920(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform her past relevant work given her RFC.  20 C.F.R. § 416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25.  If she cannot, then the fifth step requires assessment of whether, given the claimant's RFC, she can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(v).  If she cannot, she will be found disabled.  20 C.F.R. § 416.920(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1).  To determine RFC, the ALJ "'identif[ies] the individual's functional limitations or re-strictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945.'" Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *1 (July 2, 1996).  The results of this assessment

determine the claimant's ability to perform the exertional demands[9] of sustained work which may be categorized as sedentary, light, medium, heavy or very heavy.  20 C.F.R. § 416.967; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998).  This ability may then be found to be limited further by nonexertional factors that restrict the claimant's ability to work.[10]  See Michaels v. Colvin, 621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than her past work.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377,

---

[9]Exertional limitations are those which "affect only [the claimant's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. § 416.969a(b).

[10]Nonexertional limitations are those which "affect only [the claimant's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching.  20 C.F.R. § 416.969a(c).

383 (2d Cir. 2004), amended in part on other grounds on reh'q, 416 F.3d 101 (2d Cir. 2005).

In some cases, the Commissioner can rely exclusively on the medical-vocational guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step. Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995). "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy." Gray v. Chater, supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383-84. "Significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive [her] of a meaningful employment opportunity." Bapp v. Bowen, supra, 802 F.2d at 606 (footnote omitted); accord Selian v. Astrue, supra, 708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411.

29

When the ALJ finds that the nonexertional limitations signifi-
cantly diminish a claimant's ability to work, then the Commis-
sioner must introduce the testimony of a vocational expert or
other similar evidence in order to prove "that jobs exist in the
economy which [the] claimant can obtain and perform." Butts v.
Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks
omitted); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5
(1983) ("If an individual's capabilities are not described
accurately by a rule, the regulations make clear that the indi-
vidual's particular limitations must be considered.").  An ALJ
may rely on a vocational expert's testimony presented in response
to a hypothetical if there is "substantial record evidence to
support the assumption[s] upon which the vocational expert based
his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir.
1983) (footnote omitted); accord Snyder v. Colvin, 15-3502, 2016
WL 3570107 at *2 (2d Cir. June 30, 2016) (summary order) ("When
the hypothetical posed to the vocational expert is based on a
residual functional capacity finding that is supported by sub-
stantial evidence, the hypothetical is proper and the ALJ is
entitled to rely on the vocational expert's testimony."); Rivera
v. Colvin, 11 Civ. 7469 (LTS)(DF), 2014 WL 3732317 at *40
(S.D.N.Y. July 28, 2014) (Swain, D.J.) ("Provided that the
characteristics described in the hypothetical question accurately

30

reflect the limitations and capabilities of the claimant and are based on substantial evidence in the record, the ALJ may then rely on the vocational expert's testimony regarding jobs that could be performed by a person with those characteristics.").

3.   Treating Physician Rule

In considering the evidence in the record, the ALJ must give deference to the opinions of a claimant's treating physicians.  A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. § 416.927(c)(2)[11]; see also Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight.  20 C.F.R. § 416.927(c)(2); see Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3

---

[11]SSA recently adopted regulations that change the standards applicable to the review of medical opinion evidence for claims filed on or after March 27, 2017.  See 20 C.F.R. § 416.920c. Because plaintiff's claim was filed before that date, those amended regulations do not apply here.

(S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).  The Second Circuit has
noted that it "'do[es] not hesitate to remand when the Commis-
sioner has not provided "good reasons" for the weight given to a
treating physician['] s opinion.'"  Morgan v. Colvin, 592 F. App'x
49, 50 (2d Cir. 2015) (summary order) (second alteration in
original), quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir.
2004); accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015)
(per curiam).  Before an ALJ can give a treating physician's
opinion less than controlling weight, the ALJ must consider
various factors to determine the amount of weight the opinion
should be given.  These factors include:  (1) the length of the
treatment relationship and the frequency of examination; (2) the
nature and extent of the treatment relationship; (3) the medical
support for the treating physician's opinion; (4) the consistency
of the opinion with the record as a whole; (5) the physician's
level of specialization in the area and (6) other factors that
tend to support or contradict the opinion.  20 C.F.R. §
416.927(c)(2)-(6); see Schisler v. Sullivan, supra, 3 F.3d at
567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at
*16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.); Matovic v. Chater,
94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996)
(McKenna, D.J.).  Although the foregoing factors guide an ALJ's
assessment of a treating physician's opinion, the ALJ need not

expressly address each factor.  Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted.  See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see also Atwater v. Astrue, supra, 512 F. App'x at 70; Petrie v. Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order).  "The opinions of examining physicians are not controlling if they are contradicted by substantial evidence, be that conflicting medical evidence or other evidence in the record."  Krull v. Colvin, 15-4016, 2016 WL 5417289 at *1 (2d Cir. Sept. 27, 2016) (summary order); accord Monroe v. Commissioner of Soc. Sec., 16-1042-cv, 2017 WL 213363 at *1 (2d Cir. Jan. 18, 2017) (summary order).  The ALJ is responsible for determining whether a claimant is "disabled" under the Act and need not credit a physician's determination to this effect where it is contradicted by the medical record.  See Wells v. Commissioner of Soc. Sec., 338 F. App'x 64, 66 (2d Cir. 2009) (summary order).  The ALJ may rely on a consultative opinion where it is supported by substan-

33

tial evidence in the record.  See Richardson v. Perales, supra,
402 U.S. at 408; Camille v. Colvin, 652 F. App'x 25, 27-28 (2d
Cir. 2016) (summary order); Diaz v. Shalala, supra, 59 F.3d at
313 n.5; Mongeur v. Heckler, supra, 722 F.2d at 1039.


        4. Duty to
           Develop the Record


        "It is the rule in [the Second] [C]ircuit that 'the
ALJ, unlike a judge in a trial, must [him]self affirmatively
develop the record' in light of 'the essentially non-adversarial
nature of a benefits proceeding.'"  Pratts v. Chater, 94 F.3d 34,
37 (2d Cir. 1996), quoting Echevarria v. Secretary of Health &
Human Servs., 685 F.2d 751, 755 (2d Cir. 1982); see also 20
C.F.R. § 404.912(d).

        This duty exists even when the claimant is represented
        by counsel or . . . by a paralegal . . . . The [Commis-
        sioner's] regulations describe this duty by stating
        that, "[b]efore we make a determination that you are
        not disabled, we will develop your complete medical
        history . . . [and] will make every reasonable effort
        to help you get medical reports from your own medical
        sources when you give us permission to request the
        reports."  20 C.F.R. § 404.1512(d).

Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (second and third
brackets in original); accord Petrie v. Astrue, supra, 412 F.
App'x at 406 ("[W]here there are deficiencies in the record, an
ALJ is under an affirmative obligation to develop a claimant's

medical history even when the claimant is represented by counsel." (alteration in original; internal quotation marks omitted)); Halloran v. Barnhart, supra, 362 F.3d at 31 ("We have stated many times that the ALJ generally has an affirmative obligation to develop the administrative record . . . ." (internal quotation marks omitted)); Shaw v. Chater, supra, 221 F.3d at 131 ("The ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."); Tejada v. Apfel, supra, 167 F.3d at 774 (same); Van Dien v. Barnhart, 04 Civ. 7259 (PKC), 2006 WL 785281 at *14 (S.D.N.Y. Mar. 24, 2006) (Castel, D.J.) (same).

The ALJ is required "affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." Eusepi v. Colvin, 595 F. App'x 7, 9 (2d Cir. 2014) (summary order), quoting Rosa v. Callahan, 168 F.3d 72, 79 & n.5 (2d Cir. 1999); accord Swiantek v. Commissioner of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (summary order).[12]

---

[12]On March 26, 2012, the regulations were modified to delete language which imposed a duty to recontact a treating physician when "the report from [a claimant's] medical source contain[ed] a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 416.912(e)(1) (2010); see How We
(continued...)

"[T]he current amended regulations . . . give an ALJ more discre-
tion to 'determine the best way to resolve the inconsistency or
insufficiency' based on the facts of the case . . . ."  Rolon v.
Commissioner of Soc. Sec., 994 F. Supp. 2d 496, 505 (S.D.N.Y.
2014) (Nathan, D.J.), quoting 20 C.F.R. §§ 404.1520b(c)(1),
416.920b(c)(1) (2013).  However, the regulations continue to
"contemplate the ALJ recontacting treating physicians when 'the
additional information needed is directly related to that source-
's medical opinion.'"  Jimenez v. Astrue, 12 Civ. 3477 (GWG),
2013 WL 4400533 at *11 (S.D.N.Y. Aug. 14, 2013) (Gorenstein,
M.J.), quoting How We Collect and Consider Evidence of Disabil-
ity, supra, 77 Fed. Reg. at 10,652.

> "[I]f a physician's finding in a report is believed to
> be insufficiently explained, lacking in support, or
> inconsistent with the physician's other reports, the
> ALJ must seek clarification and additional information
> from the physician."  Calzada v. Asture, 753 F. Supp.
> 2d 250, 269 (S.D.N.Y. 2010); see also Rosa, 168 F.3d at
> 79 (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir.
> 1996)).  The rationale behind this rule is that "a
> treating physician's 'failure to include this type of
> support for the findings in his report does not mean
> that such support does not exist; he might not have
> provided this information in the report because he did

---

[12](...continued)
Collect & Consider Evidence of Disability, 77 Fed. Reg. 10,651,
10,651 (Feb. 23, 2012) (codified at 20 C.F.R. pts. 404, 416).
The amended regulations apply here.  See Lowry v. Astrue, 474 F.
App'x 801, 804 n.2 (2d Cir. 2012) (summary order) (applying the
version of the regulations that were current at the time the ALJ
adjudicated the plaintiff's claim).

not know that the ALJ would consider it critical to the disposition of the case.'" <u>Rosa</u>, 168 F.3d at 80 (quoting <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998)).

<u>Geronimo v. Colvin</u>, 13 Civ. 8263 (ALC), 2015 WL 736150 at *5 (S.D.N.Y. Feb. 20, 2015) (A. Carter, D.J.).

B.  <u>The ALJ's Decision</u>

The ALJ applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 12-20).

At step one of the sequential analysis, the ALJ determined that plaintiff had not engaged in substantial gainful activity since September 30, 2012, the date plaintiff filed an application for SSI (Tr. 14, <u>citing</u> 20 C.F.R. §§ 416.971 <u>et seq</u>.).  The ALJ noted that although plaintiff was paid for her participation in a job training/job search program, it did not constitute substantial gainful activity (Tr. 14).

At step two, the ALJ found that plaintiff's only severe impairment was a schizoaffective disorder (Tr. 14, <u>citing</u> 20 C.F.R. § 416.920(c)).  The ALJ found it was a severe impairment because it caused some work-related functional limitations.

At step three, the ALJ found that plaintiff's impairment did not meet the criteria of the listed impairments and that plaintiff was not, therefore, entitled to a presumption of

37

disability (Tr. 14-16).  The ALJ observed that there was no
evidence to support the criteria of any listing (Tr. 14-16).
Specifically, the ALJ analyzed whether plaintiff's impairment met
listings 12.03 (psychotic disorders) and 12.04 (affective disor-
ders).  20 C.F.R. Pt. 404, Subpt. P, App. 1.

        The ALJ then determined that plaintiff retained the RFC
to perform a full range of work at all exertional levels, with
the following nonexertional limitations:  plaintiff could (1)
remember, understand and carry out only simple instructions; (2)
maintain attention and concentration for rote work; (3) maintain
a regular schedule and (4) perform a low stress job, defined as
one with only simple decision-making, occasional (very little to
one-third of the workday) close contact with supervisors and co-
workers and no close contact with the general public (Tr. 16).

        The ALJ stated that his RFC assessment was supported
"by essentially all of the objective medical evidence in the
record" and by plaintiff's daily activities (Tr. 18).  He further
stated that his RFC determination took into consideration that
plaintiff "may have difficulty dealing with others on a consis-
tent basis, and that she has some concentration deficits" (Tr.
18).  The ALJ also noted that the evidence showed that plain-
tiff's symptoms were significantly controlled by her prescribed
medication, with no adverse side effects (Tr. 18).

The ALJ gave "significant weight" to Dr. Broska's opinion because it was consistent with her mental status examination, with Dr. Turtz's mental status examinations and with plaintiff's daily activities (Tr. 18). The ALJ gave "some weight" to Dr. Harding's opinion because the "overall evidence" supported his conclusion that plaintiff's impairment was not disabling (Tr. 18). He did not address how much weight to afford to Dr. Turtz.

The ALJ found that plaintiff was not credible. Although he found that her medically determinable impairment could reasonably be expected to cause her claimed symptoms, he found that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible (Tr. 18). The ALJ noted that Dr. Turtz's treatment notes showed that plaintiff's condition significantly improved with medication, "with a clear decrease in her most serious symptoms, hallucinations and paranoid ideation" (Tr. 18). Moreover, plaintiff was recently involved in training programs, and she testified that she had to discontinue them because of child care responsibilities, not because of psychiatric problems (Tr. 18). Additionally, plaintiff maintained a household, performed household chores, handled finances and was rearing two children who were

receiving SSI benefits due to psychiatric and psychological problems (Tr. 18).

The ALJ further concluded that he did not find credible plaintiff's testimony that she could not travel independently (Tr. 18).  He noted that plaintiff told Dr. Broska that she could travel independently, and Dr. Turtz's notes did not indicate that plaintiff could not travel alone (Tr. 18).  The ALJ "believe[d] that the record support[ed] a conclusion that the claimant . . . attempted to overstate the extent of her difficulties to a degree beyond anything warranted by her records or even her subjective presentations to her doctor" (Tr. 18).

At step four, the ALJ found that plaintiff was capable of performing her past relevant work as a cleaner (Tr. 19).

Alternatively, at step five, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform, given her age, education, work experience and RFC and the rules in the Grids (Tr. 19).  The ALJ noted that plaintiff's ability to perform work at all exertional levels was compromised by nonexertional impairments, and so testimony of a vocational expert was needed to determine the extent to which these limitations eroded the occupational base of unskilled work at all exertional levels (Tr. 20).  The ALJ wrote that he was, therefore, relying on the vocational expert's testimony that an

individual with plaintiff's age, education, work experience and
RFC could perform the requirements of cleaner, hand packager and
kitchen helper (Tr. 20).  Accordingly, the ALJ found that plain-
tiff was not disabled (Tr. 20).

    C.  Analysis of the
        ALJ's Decision

        Plaintiff contends that the ALJ failed to develop the
record because he did not obtain a medical source statement from
plaintiff's treating physician and, therefore, remand is war-
ranted (Memorandum of Law in Support of Plaintiff's Cross-Motion
for Judgment on the Pleadings, dated Apr. 12, 2016 (D.I. 23)
("Pl.'s Mem."), at 13-17).[13]

        As described above, the ALJ went through the sequential
process required by the regulations.  The ALJ's analysis at steps
one and two were decided in plaintiff's favor, and the Commis-
sioner has not challenged those findings.  The ALJ's analysis at
step three was decided in the Commissioner's favor, and plaintiff
has not challenged those findings.  I shall, therefore, limit my

---

        [13]Plaintiff also argues that the administrative record does
not contain Dr. Harding's report and that remand is necessary to
obtain the report and evaluate it (Pl.'s Mem., at 17).  However,
the Commissioner included Dr. Harding's report in the supplemen-
tal administrative record.

analysis to whether the ALJ erred by failing to develop the record at step four.

The Commissioner's regulations provide that the SSA "<u>will</u> request a medical source statement about what [the claimant] can still do despite [her] impairment(s)."  20 C.F.R. § 416.913(b)(6) (emphasis added).  Although "[t]he regulation thus seems to impose on the ALJ a duty to solicit such medical opinions," an ALJ's failure to obtain a medical source statement from a treating physician before making his disability determination is not a <u>per</u> <u>se</u> error that invariably requires remand.  <u>Tankisi v. Commissioner of Soc. Sec.</u>, 521 F. App'x 29, 33-34 (2d Cir. 2013) (summary order); <u>see</u> <u>Swiantek v. Commissioner of Soc. Sec.</u>, <u>supra</u>, 588 F. App'x at 84; <u>Pellam v. Astrue</u>, 508 F. App'x 87, 89-90 (2d Cir. 2013) (summary order); <u>see</u> <u>also</u> 20 C.F.R. § 416.913(b)(6) ("[T]he lack of the medical source statement will not make the report incomplete.").  Rather, the need for a medical source statement from the treating physician hinges on the "circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record."  <u>Sanchez v. Colvin</u>, 13 Civ. 6303 (PAE), 2015 WL 736102 at *5 (S.D.N.Y. Feb. 20, 2015) (Engelmayer, D.J.), <u>citing</u> <u>Tankisi v. Commissioner of Soc. Sec.</u>, <u>supra</u>, 521 F. App'x at 33-34.  One important consider-

ation in examining the sufficiency of the record is whether the treating physician assessed the claimant's limitations.  As explained in <u>DeLeon v. Colvin</u>, No. 3:15-CV-1106 (JCH), 2016 WL 3211419 at *4 (D. Conn. June 9, 2016) (alterations in original),

> Often, Records that are deemed to be complete without a medical source statement from a treating physician contain notes that express the treating physician's views as to a claimant's residual functional capacity, <u>i</u>.<u>e</u>., the treating physicians' views can be divined from their notes, and it is only a formal statement of opinion that is missing from the Record.  <u>See</u>, <u>e</u>.<u>g</u>., <u>Tankisi</u>, 521 F. App'x at 34 (declining to remand on the basis of the ALJ's failure to obtain a formal opinion from a treating physician and noting that "although [the medical record] does not contain formal opinions on Tankisi's RFC from her treating physicians, it does include an assessment of Tankisi's limitations from a treating physician"); <u>Whipple v. Astrue</u>, 479 F. App'x 367, 370 (2d Cir. 2012) (noting that "[t]he ALJ had comprehensive medical notes from Dr. Roger Levine, Whipple's treating physician . . . [that] observed that Whipple was capable of working and that Whipple's depression and anxiety were manageable with medica-tion").

<u>See</u> <u>Downes v. Colvin</u>, 14 Civ. 7147 (JLC), 2015 WL 4481088 at *14 (S.D.N.Y. July 22, 2015) (Cott, M.J.) ("Because the expert opinions of a treating physician as to the existence of a dis-ability are binding on the fact finder, it is not sufficient for the ALJ simply to secure raw data from the treating physician." (internal quotation marks omitted)); <u>Sanchez v. Colvin</u>, <u>supra</u>, 2015 WL 736102 at *6; <u>Swanson v. Colvin</u>, No. 12-CV-645S, 2013 WL 5676028 at *5 (W.D.N.Y. Oct. 17, 2013).

With respect to the ALJ's determination that plaintiff can remember and understand simple instructions, maintain attention and concentration for rote work and make simple decisions, the ALJ did not err by failing to obtain a medical source statement from Dr. Turtz.  Dr. Turtz's opinions regarding these limitations can be inferred from her treatment notes.  Specifically, during five mental status examinations conducted over an eight-month period after plaintiff started taking Seroquel, Dr. Turtz found that plaintiff had normal cognition and intact memory, judgment, attention/concentration and executive functioning (Tr. 196, 200, 214, 220, 224-25).  These findings by Dr. Turtz support the ALJ's conclusions set out above.  See Monroe v. Commissioner of Soc. Sec., supra, 2017 WL 213363 at *3 (ALJ's RFC determination supported by "contemporaneous medical assessments of [the claimant's] mood, energy, affect, and other characteristics relevant to her ability to perform sustained gainful activity").

The ALJ also did not err by failing to obtain a medical source statement for his determination that plaintiff could carry out simple instructions.  Although Dr. Turtz did not assess plaintiff's ability to carry out simple instructions, Dr. Broska did and her assessment is supported by substantial evidence, most notably plaintiff's participation in WEP for approximately 14

44

years in which plaintiff would have had to follow instructions to

perform her duties.

However, the ALJ did err by failing to obtain a medical

source statement concerning plaintiff's ability to maintain a

regular schedule and "perform a low stress job, defined as one

with . . . occasional . . . close interpersonal contact with

supervisors and coworkers, and no close interpersonal contact

with the general public" (Tr. 16).   Dr. Turtz never assessed

plaintiff's limitations regarding these matters and her treatment

notes do not address them directly or by implication.[14]   See

Morales v. Colvin, No. 3:16-cv-0003 (WIG), 2017 WL 462626 at *2

(D. Conn. Feb. 3, 2017) ("[T]hese [treatment] notes do not (nor

_____

[14]Although Dr. Turtz noted that plaintiff participated in
WEP (Tr. 213, 219, 223), plaintiff testified that she partici-
pated in the program only three days a week (Tr. 30).   Plaintiff
also testified that she was frequently absent because of child
care responsibilities, not because of psychiatric issues (Tr. 32,
37-38, 43).   I cannot extrapolate from this evidence whether
plaintiff could maintain a regular schedule for the entire
workweek; rather, the treating physician should assess this
ability in the first instance.

Dr. Turtz also noted that plaintiff had a tendency to get
agitated, angry and irritable if someone was condescending to her
at work but that plaintiff was less prone to do so when she was
taking her medication (Tr. 223).   Additionally, while Dr. Turtz
noted specific instances of angry outbursts (186, 243-44), she
also indicated that plaintiff's anger was milder while on medica-
tion (Tr. 194, 201, 243, 244).   Plaintiff's ability to have
interpersonal contact, therefore, cannot be inferred from Dr.
Turtz's treatment notes.

would one expect they should) reflect Plaintiff's limitations,
particularly as to how her conditions, in combination, affect her
ability to work on a sustained basis.").

          The opinions of Drs. Broska and Harding do not make up
for these deficiencies.  Dr. Broska's "statements as to [plain-
tiff] [with respect to these limitations] are far from conclu-
sive.  They are, instead, couched in hesitant, vague, and at
points equivocal terms."  Sanchez v. Colvin, supra, 2015 WL
736102 at *6.  Like the consulting psychologist in Sanchez, Dr.
Broska opined that "[i]t appears [plaintiff] can maintain a
regular schedule, "[s]he may not . . . relate adequately with
others[] or appropriately deal with stress" and "[t]he results of
the examination appear to be consistent with psychiatric problems
and it may interfere with her ability to function on a daily
basis without mental health treatment" (Tr. 178-79 (emphasis
added)).  As explained by the Honorable Paul A. Engelmayer,
United States District Judge,

          Needless to say, an individual's ability to maintain a
          regular schedule and to generally make "appropriate
          decisions" may bear significantly on her capacity to
          work.  Yet the consulting psychologist supplied the ALJ
          with no further details, analysis, or explanation on
          which to assess this capability.  In sum, in nearly
          every important sentence of her brief report, the
          consulting psychologist used hedge words . . . .

          To be sure, in some cases, this degree of uncer-
          tainty may be the most that an ALJ can realistically

46

> expect from a single visit to a consulting physician of
> a patient who may have multiple mental-health disor-
> ders.  But that underscores why, in such cases, the
> perspective of the treating physician, particularly one
> of longer standing, is generally accorded greater
> weight.  <u>See</u>, <u>e</u>.<u>g</u>., <u>Tankisi</u>, 521 F. App'x at 34 ("[T]he
> opinions of consulting physicians . . . generally have
> less value than the opinions of treating
> physicians . . . . [T]he general rule is driven by the
> observation that consultative exams are often brief,
> are generally performed without the benefit or review
> of claimant's medical history and, at best, only give a
> glimpse of the claimant on a single day.") (citation
> and internal quotation marks omitted).  That is one of
> the reasons that ALJs have the duty to seek treating
> physicians' and psychiatrists' opinions.  <u>See</u>, <u>e</u>.<u>g</u>.,
> <u>id</u>. at 33 . . . . A treating psychiatrist's insights,
> which may capture what a one-time visit to a consulting
> psychologist cannot, would be obviously valuable.

<u>Sanchez v. Colvin</u>, <u>supra</u>, 2015 WL 736102 at \*6-\*7 (last ellipses

added); <u>see</u> <u>Selian v. Astrue</u>, <u>supra</u>, 708 F.3d at 421 (ALJ's RFC

determination not supported by substantial evidence when she

relied on "remarkably vague" opinion of consulting physician).

Dr. Harding's opinions do not fill this lacuna.  Dr.

Harding did not examine plaintiff; rather, he only reviewed

plaintiff's medical records.  The ALJ's reliance on the opinion

of a physician who did not examine plaintiff is particularly

problematic in cases involving mental impairments because "obser-

vation of the patient is critical to understanding the subjective

nature of the patient's disease and in making a reasoned diagno-

sis."  <u>Rodriquez v. Astrue</u>, <u>supra</u>, 2009 WL 637154 at \*26 (inter-

nal quotation marks omitted); <u>accord</u> <u>Vazquez v. Commissioner of</u>

Soc. Sec., 14 Civ. 6900 (JCF), 2015 WL 4562978 at *14 (S.D.N.Y.
July 21, 2015) (Francis, M.J.).   Thus, "[c]ourts have held that
the conclusions of a physician who merely reviews a medical file
and performs no examination are entitled to little, if any,
weight."  Rodriguez v. Astrue, supra, 2009 WL 637154 at *26
(internal quotation marks omitted).   Indeed, the ALJ afforded Dr.
Harding's opinion only "some weight" (Tr. 18).

        Therefore, because the record does not contain suffi-
cient evidence from which the ALJ could fully consider plain-
tiff's residual functional capacity, Tankisi v. Commissioner of
Soc. Sec., supra, 521 F. App'x at 34, the ALJ failed in his duty
to develop the record.   This legal error in the ALJ's process
requires remand.   See Rosa v. Callahan, supra, 168 F.3d at 79-80;
Elliott v. Colvin, No. 13-CV-2673 (MKB), 2014 WL 4793452 at *17-
*18 (E.D.N.Y. Sept. 24, 2014) (collecting cases); see also Lacava
v. Astrue, 11 Civ. 7727 (WHP)(SN), 2012 WL 6621731 at *16-*17
(S.D.N.Y. Nov. 27, 2012) (Netburn, M.J.) (Report & Recommenda-
tion), adopted by, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012)
(Pauley, D.J.).   In reaching this conclusion, I express no
opinion as to the correctness of the ALJ's ultimate decision.

IV.   <u>Conclusion</u>

Accordingly, for all the foregoing reasons, plaintiff's motion for judgment on the pleadings is granted.  The Commis- sioner's motion is denied, and this case is remanded to the SSA for further proceedings.  The Clerk of the Court is respectfully requested to close Docket Items 16 and 22.

Dated:   New York, New York
         March 9, 2017

SO ORDERED

HENRY PITMAN
United States Magistrate Judge

Copies transmitted to

All Counsel of Record

49